IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ASHLEY GIPSON                                                                PLAINTIFF

v.                        Civil No. 2:20-cv-02043-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                               DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Ashley Gipson, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff filed her applications for benefits on February 9, 2018, alleging an onset date of February 7, 2018, due to anxiety, depression, panic disorder, obsessive compulsive disorder ("OCD"), pediatric autoimmune neuropsychiatric disorders associated with streptococcal infections[2] ("PANDAS"), attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] PANDAS is short for Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections. A child may be diagnosed with PANDAS when obsessive-compulsive disorder (OCD), tic disorder, or both suddenly appear following a streptococcal (strep) infection, such as strep throat or scarlet fever.  The symptoms are usually dramatic, happen "overnight and out of the blue," and can include motor or vocal tics or both and obsessions, compulsions, or both.  In addition to these symptoms, children may become moody or irritable, experience anxiety

tremors.  (ECF No. 15-2, pp. 54; ECF No. 15-3, pp. 18-19; ECF No. 15-3, pp. 36-37).  Plaintiff

was 24 years old on the alleged onset date.  (ECF No. 15-2, p. 65).  She had past relevant work

("PRW") as a cosmetologist, nursing home housekeeper, and nursing home laundry worker.  (ECF

No. 15-2, pp. 65, 99).

The Commissioner denied her applications initially and on reconsideration.  (ECF No. 15-

4, pp. 2-4, 5-8, 16-17, 18-19).  At Plaintiff's request (ECF No. 15-4, pp. 20-21), an Administrative

Law Judge ("ALJ") held an administrative hearing on April 11, 2019.  (ECF No. 15-2, pp. 74-

104).  Plaintiff was present and represented by counsel.

On May 30, 2019, the ALJ found Plaintiff had the following severe impairments: migraine

headaches; pediatric autoimmune neuropsychiatric disorders associated with streptococcal

infections (PANDAS); borderline intellectual functioning; depression; and anxiety.  (ECF No. 15-

2, p. 57).  The ALJ concluded that Plaintiff's impairments did not meet or medically equal one of

the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*, Finding 5).  The ALJ

determined Plaintiff retained the RFC to do the following:

> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: the claimant is limited to simple tasks, simple
> instructions and incidental contact with the public.  (*Id.*, p. 59, Finding 6).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff could perform

work as a hand packager.  (*Id.*, p. 66).  He concluded Plaintiff had not been under a disability as

---

attacks, or show concerns about separating from parents or loved ones.  PANDAS is considered a pediatric disorder
and typically first appears in childhood from age 3 to puberty.  Reactions to strep infections are rare after age 12, but
researchers recognize that PANDAS could occur, though rarely, among adolescents.  It is unlikely that someone would
experience these post-strep neuropsychiatric symptoms for the first time as an adult, but it has not been fully studied.
It is possible that adolescents and adults may have immune-mediated OCD, but this is not known.  The diagnosis of
PANDAS is a clinical diagnosis, which means that there are no lab tests that can diagnose PANDAS.  Instead, health
care providers use diagnostic criteria for the diagnosis of PANDAS.  At the present time, the clinical features of the
illness are the only means of determining whether a child might have PANDAS.  *See* National Institute of Mental
Health, *PANDAS-Questions and Answers*, at https://www.nimh.nih.gov/health/publications/pandas/ (Last Accessed
June 2, 2021).

defined by the Act from February 7, 2018, through the date of the ALJ's decision, May 30, 2019. (*Id*., pp. 66-67).

The Appeals Council denied Plaintiff's request for review on March 11, 2020. (ECF No. 15-2, pp. 2-7). She subsequently filed this action on March 30, 2020. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 19, 24), and the case is now ready for decision.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as

"an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's duty exists alongside the claimant's burden to prove his case. *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in the light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

### III.    Discussion

In her appeal brief, Plaintiff raises the following issues for reversal: (1) whether the ALJ erred in assessing her RFC; (2) whether the ALJ erred in evaluating the opinion evidence of her treating physicians; and (3) whether the ALJ erred at step four of the sequential analysis. (ECF No. 19, pp. 10-16). Because we agree that remand is warranted, we will not address each of these issues.

4

Plaintiff asserts that the ALJ's RFC determination fails to account for the limitations resulting from her OCD, ADHD, limited intellectual functioning, learning disabilities, immature nature, insomnia, and PANDAS. RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *see also Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). There is, however, no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). A claimant's RFC is "ultimately an administrative determination reserved to the Commissioner." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007). Furthermore, this Court is required to affirm the ALJ's RFC determination if that determination is supported by substantial evidence on the record as a whole. *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

Dr. Robert Spray evaluated the Plaintiff in May 2004, when she was in the fourth grade. (ECF No. 15-7, pp. 2-7). At that time, she was taking Strattera, Propranolol for headaches, and Zoloft for depression. She had undergone some psychotherapy for anger management, depression,

and ADHD.  Dr. Spray assessed marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others.  He noted that she experienced tantrums and cried uncontrollably when she did not take her medication.  Although she experienced some difficulty with her peers, she was involved in Girl Scouts and attended church. Dr. Spray diagnosed ADHD in partial remission, depression not otherwise specified, and oppositional defiant disorder.  Further, IQ testing revealed a full-scale IQ of 81, placing her in the low average range of intelligence.

In 2012, eight years prior to the relevant period, Dr. Spray performed a second mental diagnostic evaluation.  (*Id*. at 8-13).  At the time, Plaintiff was a senior in high school.  Dr. Spray indicated that the Plaintiff had problems with her attention and concentration, especially when she did not take her medication, and concluded she may have difficulty completing tasks when distracted or emotionally upset.  He also noted that she had spent nine days in-patient in September 2011, after not taking her medication and becoming violent and uncontrollable.

As the Commissioner points out, Plaintiff received no treatment for her alleged mental impairments or PANDAS during the year leading up to her alleged onset date.  On August 6, 2018, she presented to Carolyn Dillard, D.O., with complaints of depression and insomnia, requesting that she be restarted on an antidepressant and sleep aide.  (*Id*. at 28-32).  Plaintiff admitted it had been two years since she had taken an antidepressant.  According to notes from the visit, she was seeking disability "due to PANDA[S] and depression/anxiety/insomnia."  She had received this diagnosis from Vista Health, following an in-patient stay.  On exam, Plaintiff was alert, fully oriented, in no acute distress, and ambulated without assistance.  (*Id*. at 29-30).  However, she scored an 18 on her patient health questionnaire, indicating moderately severe major depression.

(*Id*. at 30).  Dr. Dillard prescribed Amitriptyline and Fluoxetine and referred her to "psych for eval."  (*Id*. at 31).

On May 3, 2018, Plaintiff presented to Patricia J. Walz, Ph.D., for a mental diagnostic consultative examination.  (*Id*. at 42-46).  She arrived on time, reporting she had previously received disability benefits for diagnoses of ADHD, OCD, ADD, and a learning disability.  (*Id*. at p. 42).  Plaintiff also reported memory problems and difficulty remaining focused, allegedly stemming from an autoimmune disorder called PANDAS that dated back to her adolescence.  (*Id*.). Furthermore, she "described her recent mood as 'meh, not wanting to get out of bed,'" but denied any current suicidal or homicidal ideations.  While in high school, Plaintiff was treated at Valley Behavioral Health for mood swings because her mother feared she would harm herself, but she denied any recent mental health treatment, opting only to have her general physician prescribe Focalin (an ADHD medication) and Fluoxetine (also known as Prozac).  Although the medications were helpful, the doctor had discontinued them three to four years earlier because she felt they were no longer necessary.  (*Id*. at 42-43).  And, Plaintiff felt she was doing okay without them. (*Id*. at 43).  As for the PANDAS, she was initially treated with an antibiotic for one year, and now only requires medication when her symptoms flare-up.  Dr. Walz found Plaintiff to be immature for her age, polite, and mildly anxious.  Her affect was consistent with her mood, her speech was clear, her thought processes were logical, and there was no evidence of any perceptual abnormalities.  Dr. Walz concluded Plaintiff's intellectual functioning was in the borderline range and diagnosed mild persistent depressive disorder, ADHD, and learning disorders in reading, spelling, and math.  (*Id*. at 45).  She also found Plaintiff's attention and concentration to be impaired, noted she was easily distracted, documented slow information processing, and concluded she would be unable to manage funds without assistance.  (*Id*. at 46).

On May 8, 2018, non-examining consultant, Abesie Kelly, Ph.D., reviewed Plaintiff's medical records and completed an RFC assessment. (ECF No. 15-3, pp. 27-30). She concluded Plaintiff had moderate limitations in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a normal workday or work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in work setting; setting realistic goals; and making plans independently. In August 2018, Christal Janssen, Psy.D, reviewed the record and affirmed Dr. Kelly's assessment. (*Id*. at 63-66).

On August 28, 2018, Plaintiff underwent a diagnostic assessment with James Gattis, NP-C, at the Center for Psychiatric Wellness. (ECF No. 15-7, pp. 65-67). Despite having been diagnosed with depression as a child, she was now uncertain whether she was presently suffering from depression, stating that her depression "comes and goes and has been present longer than two weeks." (*Id*. at 65). Plaintiff also reported a history of PANDAS and described OCD symptoms related to cleanliness and germs, as well as generalized anxiety disorder ("GAD"). She felt Prozac had been beneficial, however, she continued to have trouble falling asleep. Her energy and motivation were okay, and she was able to socialize on a limited basis. Nurse Gattis found Plaintiff to be alert and fully oriented with good eye contact and clear speech. (*Id*. at 66). Her gait, strength, tone, and station were within normal limits, and she was well groomed. Plaintiff's insight and judgment were also good, her cognition and memory within normal limits, her fund of knowledge average, and her attention and concentration within normal limits. Nurse Gattis noted that she described her mood as "blah," but her affect was incongruent with this as she appeared euthymic.

He diagnosed Plaintiff with major depressive disorder and anxiety, increased her Prozac dosage, and continued the Amitriptyline without change.  (*Id*. at 67).

On September 17, 2018, Plaintiff returned to Dr. Dillard with complaints of fatigue, anxiety, depression, and a rash on the side of her neck.  (*Id*. at 72-75).  She had taken Benadryl to no avail.  She also indicated that none of these complaints limited her activities, and her depression and anxiety were alleviated by medication.  On exam, Plaintiff was alert and fully oriented, in no acute distress, and could walk without assistance.  Dr. Dillard diagnosed generalized anxiety disorder, moderate major depressive disorder, fatigue, other specified disorders involving the immune mechanism such as streptococcus group A, a rash, and an adult body mass index of 20.0-20.9, and she prescribed Amitriptyline and Triamcinolone Acetonide topical cream.  She also referred Plaintiff to the Center for Psychiatric Wellness.  (*Id*. at 75).

On November 15, 2018, Plaintiff returned to Nurse Gattis for medication management.  (*Id*. at 87-88).  She was doing well, although she reported difficulty sleeping.  Plaintiff had not been seen since August and reported that the increased dose of Prozac made her feel like a zombie.  (*Id*.).  She had since run out of medication.  Plaintiff had also been socializing a little bit, despite reporting transient energy and motivation.  According to treatment notes, she was stressed over money but denied any other problems with anxiety.  Nurse Gattis noted that she was alert and fully oriented with normal speech, a good mood, good insight and judgment, normal cognition and memory, and no deficits in attention or concentration.  (*Id*. at 88).  Furthermore, she had a normal gait, strength, tone, and station.

On December 12, 2018, Plaintiff voiced continued complaints of anxiety and depression, also reporting an issue with her right eye.  (*Id*. at 78-80).  Her anxiety and depression were described as chronic, stable, ongoing, and moderately limiting her activities.  However, the

symptoms were alleviated by medication. Plaintiff reported seeing Nurse Gattis and taking Amitriptyline without incident but stated that she had discontinued the Fluoxetine. Dr. Dillard found her to be alert, fully oriented, and in no acute distress, and she prescribed Topamax. (*Id*., pp. 79-80). She also referred Plaintiff to Dr. Larry Linson, an ear, nose, and throat specialist.

On February 13, 2019, Plaintiff reported feeling more depressed with continued insomnia. (*Id.* at 100-101). Her energy and motivation were poor, but her aptitude was good. She was socializing some and was not suffering from anxiety. Plaintiff's medication compliance was good, she denied any side effects, and her mental status exam was within normal limits. (*Id.* at 101). Nurse Gattis prescribed Wellbutrin XL and instructed her to continue the Amitriptyline.

Plaintiff saw Nurse Gattis on two occasions in March 2019. (*Id.* at 96-99). Initially, she was doing well with improved anxiety and depression. (*Id.* at 98-99). However, on March 27, 2019, she reported increased anxiety and OCD behaviors. (*Id.* at 96-97). She was emotional and described panic attacks. Although she was sleeping well, the nightmares persisted. Her impending disability hearing seemed to be "a precipitating factor." Plaintiff was compliant with her medication, continued to deny experiencing any side effects, and reported a "pretty good" mood. (*Id.* at 97). She was euthymic, with linear and goal directed thoughts, no ideations or delusions, good judgment and insight, intact memory and concentration, and an average fund of knowledge. Nurse Gattis prescribed Zoloft and Hydroxyzine. He discontinued the Amitriptyline and decreased her Wellbutrin dosage.

On March 14, Plaintiff told Dr. Dillard that her medications were effective, and she needed refills. (*Id.* at 110-114). Although responsive to medication, her anxiety and depression moderately limited her activities. Following a normal physical exam, Dr. Dillard prescribed Topamax. (*Id.* at 112).

On June 13, 2019, Plaintiff reported experiencing two migraines over the past month, but stated that her medications were working "just fine" without complications. (*Id*. at 45-50). Dr. Dillard noted her depression to be both stable and ongoing, as well as alleviated by medication. She scored a six on the PHQ-2, indicating minimal symptoms. The Plaintiff was alert and fully oriented with an unremarkable physical exam. Dr. Dillard diagnosed moderate major depressive disorder, GAD, and migraines. She prescribed Topamax and recommended exercise as tolerated and a healthy heart diet.

On August 13, 2019, Plaintiff presented to Perspectives Behavioral Health Management. (ECF No. 15-2, p. 12). Her energy had improved but she still did not want to go out in public and "mess with people." Max Baker, M.D., noted Plaintiff had been fired from all seven jobs she had acquired over the past three years. The notes also revealed, "[s]he is working on trying to get her disability." (*Id*. at 13).

The ALJ explained that he did not give Dr. Spray's 2004 opinion great weight due to its remoteness and the fact that Dr. Spray had also assessed the Plaintiff in 2012. (ECF No. 15-2, p. 63-64). He found Dr. Spray's 2012 opinion somewhat persuasive, noting it was largely consistent with the medical record.

Likewise, he found Dr. Walz's assessment to be persuasive, to the extent it was supported by the medical evidence of record. (*Id*. at 64). The ALJ noted her opinion regarding Plaintiff's immaturity, impaired attention and concentration, easy distractibility, slow speed of information processing, and inability to manage funds.

The ALJ also considered the consultative assessments of Drs. Kelly and Janssen. (*Id*. at 63). He found them to be persuasive, as they, too were consistent with the medical record in the case. Additionally, he noted a vocational rehabilitation assessment conducted in April 2018 that

11

found Plaintiff to be functionally limited in interpersonal skills. (*Id.*). Acknowledging that these cognitive impairments were listed as severe, placing Plaintiff in the category of significantly disabled for purpose of Vocational Rehabilitation Services, the ALJ found this to be only somewhat persuasive. Recognizing that she does have some impairment in interpersonal relations, the ALJ did not find it to be severe enough to prevent her from working within the RFC as she was able to engage in social interactions on an albeit somewhat limited basis.

The ALJ then concluded Plaintiff could perform a full range of work at all exertional levels but was limited to simple tasks with simple instructions and only incidental contact with the public. This assessment, however, falls short of accounting for the problems Plaintiff will likely experience interacting with co-workers and supervisors, as found by Drs. Kelly and Janssen and echoed by Drs. Spray and Walz. Her immaturity, anxiety, depression, and OCD behaviors clearly impact her ability to work with and around others. And, as Dr. Baker noted, she had been fired from every job she had over a three-year period. For this reason, we find that remand is necessary to allow the ALJ to reconsider Plaintiff's mental RFC.

Further, because Drs. Spray and Walz were not asked to complete RFC assessments at the time of their evaluations of the Plaintiff, on remand, the ALJ is directed to obtain RFC assessments from these physicians. The ALJ should also request an RFC assessment from Nurse Gattis and Dr. Baker, asking that their assessment account for the Plaintiff's functional limitations during the relevant period.

The ALJ is reminded that the evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. (*Id.*).

Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." (*Id.*). Individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *see also Maestri v. Colvin*, No. 2:15-CV-2125-PKH-MEF, 2016 WL 4523890, at *3 (W.D. Ark. Aug. 8, 2016), report and recommendation adopted, No. 2:15-CV-2125, 2016 WL 4523899 (W.D. Ark. Aug. 29, 2016).

## IV.    Conclusion

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 15th day of July 2021.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE